## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| EMPIRE TECHNOLOGY<br>DEVELOPMENT LLC | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| AT&T SERVICES, INC., AT&T | ) | **DEMAND FOR JURY TRIAL** |
| MOBILITY LLC, AT&T | ) | |
| ENTERPRISES, LLC | ) | |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Empire Technology Development LLC ("Empire") brings this action and makes the following allegations of patent infringement of U.S. Patent Nos. 8,830,957 (the "'957 Patent") and 8,958,839 (the "'839 Patent") (together, the "Patents-in-Suit") against Defendants AT&T Services, Inc., AT&T Mobility LLC, and AT&T Enterprises, LLC (collectively, "AT&T" or "Defendants") as follows:

## THE PARTIES

1.     Empire Technology Development LLC is a limited liability company organized and existing under the laws of the state of Delaware.

2.     Defendant AT&T Services, Inc. is a Delaware corporation organized with a principal place of business at 208 South Akard Street, Dallas, TX 75202.  On information and belief, AT&T Services, Inc. is a wholly owned subsidiary of AT&T Inc.  On information and belief, AT&T Services, Inc. provides cellular communications services in this District and elsewhere in the United States.

3.      Defendant AT&T Mobility LLC is a Delaware limited liability company, with a principal place of business at 1025 Lenox Park Boulevard NE, Atlanta, GA 30319.  On information and belief, AT&T Mobility LLC is a wholly owned subsidiary of AT&T Inc.  On information and belief, AT&T Mobility LLC provides cellular communications services in this District and elsewhere in the United States.

4.      Defendant AT&T Enterprises, LLC is a Delaware limited liability company, with a principal place of business at 208 South Akard Street, Dallas, Texas 75202.  On information and belief, AT&T Enterprises, LLC is a wholly owned subsidiary of AT&T Inc.  On information and belief, AT&T Enterprises, LLC provides cellular communications services in this District and elsewhere in the United States.

5.      On information and belief, AT&T conducts business operations within this District through its offices located at 2900 W. Plano Pkwy, Plano, TX 75075 and multiple retail stores located in this District.

6.      AT&T operates one or more U.S. cellular networks to provide wireless telecommunications services, including within the Eastern District of Texas, under brand names including but not limited to "AT&T."

7.      On information and belief, AT&T makes, uses, offers to sell, sells, and/or imports instrumentalities that use, practice, and/or embody the infringing methods, products, and/or systems in this District and elsewhere in the United States (the "Accused Instrumentalities").

8.      The Accused Instrumentalities are AT&T's U.S. cellular networks, including cellular base stations and related equipment that support and perform handovers, *e.g.*, between 5G and LTE networks (the "'957 Patent Accused Instrumentalities") and AT&T's U.S. cellular

networks, including cellular base stations and related equipment that support and perform power control, *e.g.*, Ericsson base station antennas (the "'839 Patent Accused Instrumentalities").

## JURISDICTION AND VENUE

9.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq*.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this is a civil action arising under the Patent Act.

10.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b).

11.     On information and belief, AT&T has committed acts of infringement in this District while maintaining a regular and established place of business in this District.

12.     On information and belief, each Defendant is subject to this Court's jurisdiction because each Defendant has sufficient minimum contacts within the State of Texas and this District, pursuant to due process and/or the Texas Long Arm Statute because each Defendant purposefully availed itself of the privileges of conducting business in the State of Texas and in this District, because each Defendant regularly conducts and solicits business within the State of Texas and within this District, and because Plaintiffs' causes of action arise directly from each of Defendants' business contacts and other activities in the State of Texas and this District.

13.     On information and belief, each Defendant, directly and/or through subsidiaries or intermediaries, has committed acts of infringement in this District by, without authority making, using, offering to sell, selling and/or importing the Accused Instrumentalities in this District.

14.     As AT&T has previously admitted in court papers filed in this District, "AT&T admits that it operates a wireless telecommunications network to provide telecommunications services in Texas, including within the Eastern District of Texas" and "has advertised its 4G LTE and 5G services in the United States, including in Texas and within the Eastern District of Texas." Answer at 4, *Daingean Techs. Ltd. v. AT&T Corp.*, No. 2:23-cv-00123, Dkt. No. 22 (E.D. Tex.

Jun. 1, 2023).  AT&T has also previously admitted in patent infringement cases that venue is

proper in this District and that such Court may exercise personal jurisdiction over AT&T.  *See id.*

at 5; Answer at 14, *Headwater Research LLC v. AT&T Inc.*, No. 2:23-cv-00397, Dkt. No. 28 (E.D.

Tex. Nov. 13, 2023).

15.    AT&T also maintains multiple retail stores in this District.  These brick-and-mortar

retail stores are regular and established places of business of AT&T and are used by AT&T to

actively market and sell services for the AT&T wireless networks that use the Accused

Instrumentalities.  For example, AT&T stores exist at numerous locations, including but not

limited to, stores at: 190 E Stacy Road Suite 214, Allen, TX 75002; 1103 E Tyler Street, Athens,

TX 75751; 4460 Dowlen Road, Beaumont, TX 77706; 351 TX-243 Suite 200, Canton, TX 75103;

2520 W University Drive Suite 1180, Denton, TX 76201; 3551 Preston Road, Frisco, TX 75034;

1214 US-259 Suite 102, Kilgore, TX 75662; 318 N Main Street Suite B, Lindale, TX 75771; 109

W Loop 281, Longview, TX 75605; 1712 E Grand Avenue, Marshall, TX 75670; 3402 North

Street, Nacogdoches, TX 75965; 1335 S Broadway Street Suite 10, Sulphur Springs, TX 75482;

5112 Summerhill Road, Texarkana, TX 75503; and 4757 S Broadway Avenue, Tyler, TX 75703.

16.    Further, AT&T advertises that its 5G+ and 5G (collectively, "AT&T 5G

Networks") and 4G LTE networks are available within the Eastern District of Texas.  *See, e.g.*,

https://www.att.com/maps/wireless-coverage.html:



17.    On information and belief, AT&T also owns, leases, maintains, and/or operates cellular base stations throughout this District to sell and provide cellular services to customers, utilizing the Accused Instrumentalities.

## THE PATENTS-IN-SUIT

18.    Empire is the owner by assignment of U.S. Patent No. 8,830,957, entitled "DYNAMIC INTERNETWORK LOAD BALANCING," which issued on September 9, 2014.  A true and correct copy of the '957 Patent is attached hereto as Exhibit A.

19.    The '957 Patent is directed to systems and methods for load-balancing a wireless cellular network by performing handovers, *e.g.*, between a 5G cellular network and a 4G LTE cellular network.

20.    Empire is the owner by assignment of U.S. Patent No. 8,958,839, entitled "POWER CONTROL OF CONTROL CHANNELS IN AN LTE SYSTEM," which issued on February 17, 2015.  A true and correct copy of the '839 Patent is attached hereto as Exhibit B.

21.    The '839 Patent is directed to systems and methods for power control of control channels in a wireless cellular network.

## PATENT ELIGIBILITY

22.    The asserted claims in the Patents-in-Suit are directed to patent-eligible subject matter because they are not abstract and include inventive concepts that distinguish them from what was well known in the art.

23.    The '957 and '839 Patents provide technical advances for achieving faster data transmission and improved quality of service as cellular networks have become increasingly complex, requiring more robust coordination between cellular base stations and mobile phones.

24.    Specifically, with the advent of 4G LTE and 5G technology, both base stations and user equipment ("UEs") (*e.g.*, mobile devices) require different hardware to enable communication over higher frequencies traveling shorter distances.

25.    Thus, load balancing and power control have become critically important features in today's cellular networks because of the increased number of phones within the range of each cellular tower and the need to perform both power boost to maximize range and handovers where, *e.g.*, 5G coverage may be limited due to signal interference in the communications channel.  The claims disclosed in the Patents-in-Suit are directed to specific technical solutions to solve technical problems, including insufficient signal quality in transmissions to mobile phones.

26.    The '957 Patent was filed in 2010, when the number of smartphone users began to climb and existing networks made more intensive data usage on smartphones possible.  The increase in data-intensive user demands added considerable strain to networks, leading to outages and dead zones in highly congested areas.[1]  Wireless carriers like AT&T worked intensively to upgrade and improve networks and services.  The use of network load balancing was not well-

---

[1] Suzanne Choney, *Is 2010 the Year of Wireless Congestion?*, NBC News (Jan. 4, 2010 8:47 AM), https://www.nbcnews.com/id/wbna34647727.

understood or routine.  Heterogenous wireless networks were in the early stages of development when the '957 Patent application was filed, and the challenge of optimizing vertical handover decisions in wireless networks continues to be an ongoing area of research and development.[2]

27.     The inventions claimed in the '957 Patent improve the user experience of AT&T customers by streamlining the vertical handover between AT&T's wireless networks, including 5G and 4G LTE networks, to limit noticeable service interruptions while network switching.  For example, the '957 Patent claims inventions that "determin[e] candidates for vertical handovers" through a technical process.  Ex. A at 14:34.

28.     Delving deeper into the process for determining candidates for vertical handovers, the '957 Patent includes a figure of a multiuser table used by a manager to coordinate vertical handovers in wireless devices connected to wireless networks and notes that a "multiuser table [] may also indicate whether a trigger event has occurred."  Ex. A at 7:60-61, Figure 3.  A trigger event "may be associated with the network, core or user information."  Ex. A at 7:62-63.  Claim 1 of the '957 Patent, for example, describes a method where the multiuser table "includ[es] network information and user information from the first and second wireless networks, and core information from a core network that is separately coupled to the first and second wireless networks."  Ex. A at 14:47-51.  Figure 3 of the '957 Patent includes network, core, and user

---

[2]     Qualcomm, *LTE Advanced: Heterogeneous Networks* 3 (Jan. 2011), https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Research_LTE_Heterogeneous_Networks.v2.20110201.pdf ("Future gains of wireless networks will be obtained more from advanced network topology, which will bring the network closer to the mobile users."); *see also, e.g.,* E.M. Malathy & Vijayalakshmi Muthuswamy, *State of Art: Vertical Handover Decision Schemes in Next-Generation Wireless Network*, 3 J. Commc'ns & Info. Networks 43 (Mar. 2018) ("Mobile roaming with a wide range of access network technologies, including WLAN, WiMAX, satellite networks, and cellular networks, creates challenges in heterogeneous networks.").

information, and indicates whether a trigger event has occurred and whether the user is a candidate

for a network swap.

Multiuser Table 300

| Row | NW | NW Info. | Core NW | Core Info. | W.D. | User Info. | Trigger Event? | Swap Can.? | Swap NW |
|-----|-----|-----------|---------|------------|------|-------------|----------------|------------|---------|
| 310 | 120 | Buffer - 5Mbs | 110 | Strm. Video | 122 | Sec. 128-bit | No | No | n/a |
| 320 | 120 | Buffer - 5Mbs | 110 | Strm. Video | 124 | Sec. 32-bit | Yes | Yes | 130 |
| 330 | 120 | Buffer - 5Mbs | 110 | Strm. Video | 126 | Min. 1Mbs | No | No | n/a |
| 340 | 120 | Buffer - 5Mbs | 110 | Strm. Video | 128 | Min. 0.5Mbs | No | No | n/a |
| 350 | 130 | Buffer - 1Mbs | 110 | Strm. Video | 132 | Loss < 0.05% | Yes | Yes | 120 |
| 360 | 130 | Buffer - 1Mbs | 110 | Strm. Video | 134 | Sec. 64-bit | No | No | n/a |
| 370 | 130 | Buffer - 1Mbs | 110 | Strm. Video | 136 | Delay < 25ms | No | No | n/a |
| 380 | 130 | Buffer - 1Mbs | 110 | Strm. Video | 138 | Strm. Video | No | No | n/a |

FIG. 3

29.    Figure 5 of the '957 Patent illustrates "example methods for vertical handovers of

wireless devices configured to couple with heterogeneous wireless networks." Ex. A at 8:42-44,

Figure 5.  Figure 5 illustrates a technical, multistep solution to the challenge of determining which

devices are candidates for vertical handovers and executing accordingly, to the betterment of each

individual user's experience and the overall network.



FIG.5

30.    The strain on service carriers, including AT&T, when widespread adoption of smartphones began to take hold demonstrates that the claims of the '957 Patent were neither routine nor well-understood.  At least claim 1 of the '957 Patent outlines an implementable inventive method with advantageous results.

31.    The '839 Patent claimed inventions address the need to make cellular transmissions sufficiently robust by allocating power without wasting energy by allocating more than is necessary for reliable transmission.  This is critical to maintaining high-power transmission to a mobile phone as it travels farther from a base station, and to avoiding interruption of data streaming or video calls.

32.    In a wireless communication system, a base station serves a number of different mobile users depending on the location of those users at a given point.  When multiple UEs are within range of a certain base station, they may share system resources.  The base station therefore makes determinations as to how to allocate shared resources to those UEs in range, and will transmit relevant scheduling information on a Physical Downlink Control Channel ("PDCCH") in both a common search space and UE-specific search space.

33.    The PDCCH is one of the most important channels in a wireless network—if its performance cannot be guaranteed, and if the UEs cannot correctly receive such scheduling information on the PDCCH, system resources may be wasted and the quality of service for users may suffer.

34.    Therefore, as the number of phones within the range of each cellular tower increases, so too does the complexity of managing system resources without compromising quality of service for each mobile user.

35.    The inventions claimed in the '839 Patent improve the user experience of AT&T customers by increasing the robustness of the PDCCH through a method for power control, *e.g.*, a power boost feature that increases robustness of the PDCCH by increasing the PDCCH power when it is necessary to do so.  This makes it possible to adjust the power of the PDCCH to match the number of needed Control Channel Element ("CCE") resources, thereby improving PDCCH capacity.  This allows a UE to enjoy improved network performance without wasting system resources.

36.    Before the '839 Patent's inventions, limited PDCCH resources in traditional systems resulted in UEs being deprived of consistent or sufficient resource access, which proved to be a major connectivity challenge for LTE wireless systems.[3]  At least claims 1 and 4 of the '839 Patent outline an implementable inventive method directed at addressing this issue.

37.    A person of ordinary skill in the art would understand that the asserted claims in the Patents-in-Suit recite elements that are not merely a conventional system or method to execute network balancing in a heterogeneous network system or power control, but are an improvement to data transmission and quality of service.  These advances are increasingly important due to the increased use and reliance on smartphones since the Patents-in-Suit were applied for and issued, as well as the continued upgrading of wireless networks.

---

[3] *See* B. Alhaji Salihu et al., *New Remapping Strategy for PDCCH Scheduling for LTE-Advanced Systems*, 9 J. Commc'ns 563, 563 (July 2014) https://www.jocm.us/uploadfile/2014/0731/20140731034027560.pdf ("[T]he limited PDCCH resources in traditional systems usually result to some UEs being deprived from accessing [Physical Resource Blocks] because they have not been scheduled for resource access by PDCCH. This situation is a major connectivity challenge in LTE-A systems.")

## COUNT I

**(Infringement of U.S. Patent No. 8,830,957)**

38.    Empire incorporates herein by reference paragraphs 1 through 37 above as if set forth in full.

39.    Defendants make, use, offer to sell, sell, and/or import products and/or services for operation on its networks that execute, perform, and/or practice vertical handovers of wireless devices configured to couple with heterogenous wireless networks.

40.    Defendants' products and services include technologies executing vertical handovers of wireless devices configured to couple with heterogenous wireless networks that infringe at least claim 1 of the '957 Patent.

41.    Defendants have infringed and continue to infringe the '957 Patent, including at least claim 1 of the '957 Patent, pursuant to 35 U.S.C. § 271(a), literally, or under the doctrine of equivalents, by making, using (including by directing and controlling the equipment and instrumentalities mentioned below), importing, selling, and offering for sale and supplying to customers infringing products and services, including the '957 Patent Accused Instrumentalities without authority or license.

42.    Defendants indirectly infringe the '957 Patent, including at least claim 1 of the '957 Patent, pursuant to 35 U.S.C § 271(b), by (among other things) and with specific intent or willful blindness, actively aiding and abetting infringement by others, such as Defendants' customers and end-users, in this District and elsewhere in the United States.  For example, through at least the filing and service of this Complaint, Defendants have had knowledge of the '957 Patent and the infringing nature of the '957 Patent Accused Instrumentalities.  Defendants' customers and end-users directly infringe through the use of the inventions claimed in the '957 Patent.  Defendants

induce this direct infringement by actively encouraging and instructing users of its services and products to use the '957 Patent Accused Instrumentalities.

43.     Claim 1 of the '957 Patent is reproduced below with the addition of labels [a], [b], [c], [d], and [e] corresponding to portions of the claim.

1.  A method for vertical handovers, comprising:

[a] receiving an indication of one or more triggering events associated with vertical handovers of wireless devices; determining candidates for vertical handovers including a first wireless device coupled to a first wireless network and a second wireless device coupled to a second wireless network; and

[b] performing the vertical handovers including:

[c] executing a first vertical handover of the first wireless device from the first wireless network to the second wireless network, executing a second vertical handover of the second wireless device from the second wireless network to the first wireless network, and

[d] maintaining, by multiple vertical handoff managers each collocated at a respective access node,

[e] a multiuser table including network information and user information from the first and second wireless networks, and core information from a core network that is separately coupled to the first and second wireless networks.

Ex. A ('957 Patent) at 14:30-51.

44.     AT&T directs and controls all aspects of the '957 Patent Accused Instrumentalities deployed in its wireless networks.

45.     The '957 Patent Accused Instrumentalities embody and/or practice each and every limitation of at least claim 1 of the '957 Patent, literally or under the doctrine of equivalents, as described in the non-limiting examples set forth below.   These non-limiting examples are preliminary and are not intended to limit Empire's right to provide greater detail and scope concerning AT&T's infringement, including infringement by other aspects of the Defendants' cellular networks, products, or services, and other claims of the '957 Patent.

**"1.     A method for vertical handovers, comprising:"**

46.     The '957 Patent Accused Instrumentalities provide and perform a method for vertical handovers. AT&T directs and controls all aspects of the '957 Patent Accused Instrumentalities that provide and perform a method for vertical handovers in AT&T's wireless networks.

47.     For example, AT&T, through the direction and control of the '957 Patent Accused Instrumentalities in its wireless networks, performs a method of executing vertical handovers where both 5G and LTE networks are available.   AT&T advertises its ability to deliver "three flavors of 5G to [its] customers to give them unique experiences, faster speeds and capacity to do more of the things they like on [its] 5G network."  These "three flavors" are low-band, mid-band, and high-band spectrum 5G+ networks.  https://about.att.com/pages/5g-plus.html.

48.     AT&T also advertises the capabilities of its 4G LTE network, stating, "[w]ith 4G Long Term Evolution (LTE[2]) technology, we can meet your demands to access a variety of content over our mobile network. We use a variety of technologies and frequencies to support our network."  https://www.att.com/support/article/wireless/KM1008740/.

49.    Furthermore, due to coverage issues, load balancing, network conditions, voice services, etc., AT&T supports and performs handover between its various 5G Network and 4G LTE technologies.  For example, AT&T uses the '957 Patent Accused Instrumentalities to conduct Evolved Packet System ("EPS") fallback, a mobility procedure by which UE changes radio access from 5G to 4G LTE for voice calls.  *See* https://www.techplayon.com/5g-eps-fallback-5g-to-4g-handover/.

50.    As an example, the figure below shows the UE mobility path by a dotted line during which a UE experiences mobility from 5G to 4G, from 4G to 4G, and from 4G to 5G.  The gNB (5G base station) and eNB (4G base station) are co-located, with gNB operating on a higher frequency band with a lower coverage footprint and eNB operating on a lower frequency band with a larger coverage footprint.



https://www.techplayon.com/5g-eps-fallback-5g-to-4g-handover/.

**"[a]    receiving an indication of one or more triggering events associated with vertical handovers of wireless devices; determining candidates for vertical handovers including a first wireless device coupled to a first wireless network and a second wireless device coupled to a second wireless network; and"**

51.     The '957 Patent Accused Instrumentalities receive an indication of one or more triggering events associated with vertical handovers of wireless devices and determine candidates for vertical handovers including a first wireless device coupled to a first wireless network and a second wireless device coupled to a second wireless network.  AT&T directs and controls the '957 Patent Accused Instrumentalities in determining candidates for vertical handovers.

52.     For various reasons (*e.g.*, coverage issues, load balancing, network conditions, voice services), a first wireless device coupled with a first wireless network (*e.g.*, 5G) may connect to a second wireless network (*e.g.*, 4G LTE) through a vertical handover.  Alternatively, a second wireless device coupled with a second wireless network (*e.g.*, 4G LTE) may connect to a first wireless network (*e.g.*, 5G) through a vertical handover.  As another example, a wireless device coupled with a first wireless network (*e.g.*, high-band 5G (mmWave)) may connect to a second wireless network (*e.g.*, low-band 5G) through a vertical handover.

53.     The '957 Patent Accused Instrumentalities determine whether a UE coupled to a first wireless network is a candidate for vertical handover to a second wireless network by monitoring for and responding to certain handover triggering events.

54.     For example, the 3rd Generation Partnership Project ("3GPP")—a group of organizations that promulgates protocols for mobile telecommunications, which AT&T follows—provides standards and related documents, such as TS 38.300, that describe handover between a first wireless network, comprising a 5G gNB base station, and a second wireless network, comprising a 4G LTE eNB or ng-eNB base station, and associated components of the '957 Patent Accused Instrumentalities.

## 4.1    Overall Architecture

An NG-RAN node is either:

- a gNB, providing NR user plane and control plane protocol terminations towards the UE; or

- an ng-eNB, providing E-UTRA user plane and control plane protocol terminations towards the UE.

The gNBs and ng-eNBs are interconnected with each other by means of the Xn interface. The gNBs and ng-eNBs are also connected by means of the NG interfaces to the 5GC, more specifically to the AMF (Access and Mobility Management Function) by means of the NG-C interface and to the UPF (User Plane Function) by means of the NG-U interface (see TS 23.501 [3]).

NOTE:    The architecture and the F1 interface for a functional split are defined in TS 38.401 [4].

The NG-RAN architecture is illustrated in Figure 4.1-1 below.



**Figure 4.1-1: Overall Architecture**

3GPP TS 38.300 version 18.6 (2025-06).

55.    TS 38.300 provides an overview of mobility and state transitions.

## 9.1    Overview

Load balancing is achieved in NR with handover, redirection mechanisms upon RRC release and through the usage of inter-frequency and inter-RAT absolute priorities and inter-frequency Qoffset parameters.

Measurements to be performed by a UE for connected mode mobility are classified in at least four measurement types:

-   Intra-frequency NR measurements;

-   Inter-frequency NR measurements;

-   Inter-RAT measurements for E-UTRA;

-   Inter-RAT measurements for UTRA.

For each measurement type one or several measurement objects can be defined (a measurement object defines e.g. the carrier frequency to be monitored).

For each measurement object one or several reporting configurations can be defined (a reporting configuration defines the reporting criteria). Three reporting criteria are used: event triggered reporting, periodic reporting and event triggered periodic reporting.

The association between a measurement object and a reporting configuration is created by a measurement identity (a measurement identity links together one measurement object and one reporting configuration of the same RAT). By using several measurement identities (one for each measurement object, reporting configuration pair) it is then possible to:

-   Associate several reporting configurations to one measurement object and;

-   Associate one reporting configuration to several measurement objects.

The measurements identity is used as well when reporting results of the measurements.

Measurement quantities are considered separately for each RAT.

Measurement commands are used by NG-RAN to order the UE to start, modify or stop measurements.

Handover can be performed within the same RAT and/or CN, or it can involve a change of the RAT and/or CN.

Inter system fallback towards E-UTRAN is performed when 5GC does not support emergency services, voice services, for load balancing etc. Depending on factors such as CN interface availability, network configuration and radio

conditions, the fallback procedure results in either RRC_CONNECTED state mobility (handover procedure) or RRC_IDLE state mobility (redirection), see TS 23.501 [3] and TS 38.331 [12].

56.    When a triggering event occurs, the '957 Patent Accused Instrumentalities determine whether the UE is a candidate for a vertical handover. For example, 3GPP describes the EPS fallback procedure for IP Multimedia Subsystem ("IMS") voice when a triggering event

occurs. It shows that a triggering event may, for example, cause a first wireless device to "fallback" from a first wireless network, comprising a NG-RAN. [4]



3GPP TS 23.502 version 19.0.0 (2024-06) (annotated).

57.    3GPP has explained EPS Fallback for IMS voice as follows:

NG-RAN is configured to support EPS [4G] fallback for IMS voice and decides to trigger fallback to EPS, taking into account UE capabilities, indication from AMF that "Redirection for EPS fallback for voice is possible" (received as part of initial context setup, handover resource allocation or path switch request acknowledge as defined in TS 38.413 [10]), network configuration (e.g. N26 availability configuration) and radio conditions. If NG-RAN decides not to trigger fallback to EPS, then the procedure stops here and following steps are not executed.

3GPP TS 23.502 version 19.0.0 (2024-06) (annotated).

---

[4] Next Generation Radio Access Network ("NG-RAN") is the radio access network of the 5G ecosystem responsible for connecting user equipment to the 5G core network. https://www.telcomaglobal.com/p/ng-ran-architecture.

58.    As another example, the '957 Patent Accused Instrumentalities perform a handover by inter-system data forwarding from a second wireless network, comprising EPS (4G LTE) to a first wireless network, comprising 5GS (5G System).[5]

## 9.3.3    NR-E-UTRA mobility: From EPC to 5GC

### 9.3.3.1    Data Forwarding for the Control Plane

Control plane handling for inter-System data forwarding from EPS to 5GS follows the following key principles:

- Only forwarding of downlink data is supported.

- The target NG-RAN node receives in the Handover Request message the mapping between E-RAB ID(s) and QoS Flow ID(s). It decides whether to accept the data forwarding for E-RAB IDs proposed for forwarding within the Source NG-RAN Node to Target NG-RAN Node Transparent Container. Based on availability of direct data forwarding path the source eNB may request to apply direct data forwarding by indicating direct data forwarding availability to the CN.

- In case of indirect data forwarding:

  - The target NG-RAN node assigns a TEID/TNL address for each PDU session for which at least one QoS flow is involved in the accepted data forwarding.

  - The target NG-RAN node sends the Handover Request Acknowledge message in which it indicates the list of PDU sessions and QoS flows for which it has accepted the data forwarding.

  - A single data forwarding tunnel is established between the UPF and the target NG-RAN node per PDU session for which at least data for a single QoS Flow is subject to data forwarding.

  - The source eNB receives in the Handover Command message the list of E-RAB IDs for which the target NG-RAN node has accepted data forwarding of corresponding PDU sessions and QoS flows.

- In case of direct data forwarding:

  - The source eNB indicates direct path availability to the CN. The source eNB's decision is indicated by the CN to the target NG-RAN node.

  - The target NG-RAN node assigns a TEID/TNL address for each E-RAB it accepted for data forwarding.

  - The source eNB receives in the Handover Command message the list of E-RAB IDs for which the target NG-RAN node has accepted data forwarding.

3GPP TS 38.300 version 18.6.0 (2025-06).

**"[b]    performing the vertical handovers including:"**

---

[5] Evolved Universal Terrestrial Radio Access ("E-UTRA") is the radio access technology used in a 4G LTE mobile system.  It is responsible for connecting user equipment to the 4G LTE network. *See* https://www.pcmag.com/encyclopedia/term/e-utran.

59.    The '957 Patent Accused Instrumentalities perform vertical handovers. AT&T directs and controls the '957 Patent Accused Instrumentalities in performing such vertical handovers.

60.    After determining UEs for handovers as set forth above, the '957 Patent Accused Instrumentalities perform those handovers. For example, as 3GPP has explained in its Technical Specification standards: "Source NG-RAN initiates Xn based Inter NG-RAN handover . . . or N2 based inter NG-RAN handover . . . or redirection to E-UTRA connected to 5GC . . . . The SMF reports change of the RAT type if subscribed by PCF." 3GPP TS 23.502 version 19.0.0 (2024-06) (annotated).

**"[c]    executing a first vertical handover of the first wireless device from the first wireless network to the second wireless network, executing a second vertical handover of the second wireless device from the second wireless network to the first wireless network, and"**

61.    The '957 Patent Accused Instrumentalities execute a first vertical handover of the first wireless device from the first wireless network to the second wireless network and execute a second vertical handover of the second wireless device from the second wireless network to the first wireless network. AT&T directs and controls the '957 Patent Accused Instrumentalities in executing such vertical handovers.

62.    For example, the '957 Patent Accused Instrumentalities execute a first vertical handover from NG-RAN (a first wireless network) to E-UTRAN (a second wireless network).

63.    3GPP describes the handover procedure from NG-RAN to E-UTRAN using N26 interface (an interface that enables interworking between 4G and 5G) as follows and as demonstrated by the following figure. For clarity, a Public Land Mobile Network ("PLMN")

refers to the global unique identifier that allows mobile devices to connect to specific mobile networks.

In the case of handover to a shared EPS [4G] network, the source NG-RAN determines a PLMN to be used in the target network as specified by TS 23.501 [2]. The source NG-RAN shall indicate the selected PLMN ID to be used in the target network to the AMF as part of the TAI sent in the HO Required message.

In the case of handover from a shared NG-RAN, the AMF may provide the MME with an indication that the 5GS PLMN is a preferred PLMN at later change of the UE to a 5GS shared networks.

During the handover procedure, as specified in clause 4.9.1.3.1, the source AMF shall reject any SMF+PGW-C initiated N2 request received since handover procedure started and shall include an indication that the request has been temporarily rejected due to handover procedure in progress.

Upon reception of a rejection for an SMF+PGW-C initiated N2 request(s) with an indication that the request has been temporarily rejected due to handover procedure in progress, the SMF+PGW-C behaves as specified in TS 23.401 [13].



3GPP TS 23.502 version 19.0.0 (2024-06).

64.     Additionally, the '957 Patent Accused Instrumentalities execute a second vertical handover from E-UTRAN (a second wireless network) to 5G-RAN (a first wireless network).

65.     As an example, 3GPP shows the single registration-based interworking from E-UTRAN (4G LTE) to NR-RAN (5G) procedure in the following figure:



3GPP TS 23.502 version 19.0.0 (2024-06).

**"[d]    maintaining, by multiple vertical handover managers each collocated at a respective access node,"**

66.    The '957 Patent Accused Instrumentalities include and use multiple vertical handover managers each collocated at a respective access node.  AT&T directs and controls the '957 Patent Accused Instrumentalities in such use of multiple vertical handover managers.

67.    For example, due to coverage issues, load balancing, network conditions, voice services, etc., AT&T supports handover between its 5G Network and 4G LTE technology.  AT&T uses the '957 Patent Accused Instrumentalities to conduct EPS fallback, a mobility procedure by

which user equipment changes radio access from 5G to 4G LTE for voice calls.  *See* https://www.techplayon.com/5g-eps-fallback-5g-to-4g-handover/.

68.    As an example, the figure below shows the UE mobility path by a dotted line during which a UE performs mobility from 5G to 4G, from 4G to 4G, and from 4G to 5G.  The gNB (5G base station) and eNB (4G base station) are co-located, with gNB operating on a higher frequency band with a lower coverage footprint and eNB operating on a lower frequency band with a larger coverage footprint.



https://www.techplayon.com/5g-eps-fallback-5g-to-4g-handover/.

69.    In this example, if a UE leaves the 5G range of an access node (shown in red), it may fallback to the 4G network collocated at the same access node (shown in blue).

**"[e]    a multiuser table including network information and user information from the first and second wireless networks, and core information from a core network that is separately coupled to the first and second wireless networks."**

70.    The '957 Patent Accused Instrumentalities maintain, by multiple vertical handover managers each collocated at a respective access node, a multiuser table including network information and user information from the first and second wireless networks, and core information from a core network that is separately coupled to the first and second wireless

networks.  AT&T directs and controls the '957 Patent Accused Instrumentalities in the maintenance of such multiuser table.

71.    As one example, Neighbor Cell Relation ("NCR") tables are multiuser tables that store network information and user information.

72.    The Automatic Neighbor Relation ("ANR") function resides in the base station and "relieve[s] the operator from the burden of manually managing NCRs."  The following figure is illustrative of ANR and its environment:



3GPP TS 38.300 V18.2.0 (2024-06) (annotated).

73.    As illustrated by this figure, the ANR function "allows OAM [the operator] to manage the NCRT" and informs the OAM system about changes in the NCRT.  *See* 3GPP TS 38.300 V18.2.0 (2024-06) (annotated).

74.    The Inter-system Automatic Neighbor Relation ("Inter-system ANR") function uses ANR to manage neighbor cell relations between different frequencies.  The following figure

depicts what happens when a NG-RAN (5G) node—serving Cell A—has an Inter-system ANR function:



3GPP TS 38.300 V18.2.0 (2024-06) (annotated).

75.    An NG-RAN (5G) node may instruct a UE to detect E-UTRA (4G) cells in a target system.  In response, the UE will conduct a scan of E-UTRA cells connected to the 4G LTE mobile network, and then report back to the NG-RAN node regarding the Physical Cell Identity ("PCI") of cells in the target system.  The NG-RAN node will use that information to update its inter-system NCR tables.  *See* 3GPP TS 38.300 V18.2.0 (2024-06) (annotated).

76.    The N26 interface and related architecture is a core network that stores core information and is separately coupled to the first and second wireless networks.  The below figure shows that the Access and Mobility Management Function ("AMF") coupled to the 5G network and Mobility Management Entity ("MME") coupled to the 4G network connect through the N26

interface and perform the registration procedure with Home Subscriber Server ("HSS") and Unified Data Management ("UDM") to interconnect and exchange subscription data when the UE moves between 5G and 4G.



3GPP TS 23.501 V19.0.0 (2024-06) (annotated).

77.    As 3GPP has stated:

Interworking procedures using the N26 interface, enables the exchange of MM [mobility management] and SM [session management] states between the source and target network. The N26 interface may be either intra-PLMN or inter-PLMN (e.g. to enable inter-PLMN mobility). When interworking procedures with N26 is used, the UE operates in single-registration mode. For the 3GPP access, the network keeps only one valid MM state for the UE, either in the AMF or MME. For the 3GPP access, either the AMF or the MME is registered in the HSS+UDM.

The support for N26 interface between AMF  in 5GC and MME  in EPC is required to enable seamless session continuity (e.g. for voice services) for inter-system change."

3GPP TS 23.501 5.17.2.2.1 V19.0.0 (2024-06) (annotated).

78.    Defendants' infringement is willful, as AT&T had knowledge of the '957 Patent at least since the filing and service of this Complaint before using the '957 Patent Accused Instrumentalities.

79.     Without permission from or compensation to Empire, Defendants have used—and continue to use—the '957 Patent Accused Instrumentalities in the U.S. based on the pioneering technology in the '957 Patent.

80.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '957 Patent.  Empire has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for the infringement of the '957 Patent.

81.     As a result of Defendants' infringement of the '957 Patent, Empire has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants together with interest and costs as fixed by the Court.

## COUNT II

### (Infringement of U.S. Patent No. 8,958,839)

82.     Empire incorporates herein by reference paragraphs 1 through 81 above as if set forth in full.

83.     Defendants make, use, offer to sell, sell, and/or import products and/or services for operation on its networks that execute, perform and/or practice a method for power control of control channels.

84.     Defendants' products and services include technologies performing and providing a method for power control of control channels in a radio communication system that infringe at least claims 1 and 4 of the '839 Patent.

85.     Defendants have infringed and continue to infringe the '839 Patent, including at least claims 1 and 4 of the '839 Patent, pursuant to 35 U.S.C. § 271(a), literally, or under the doctrine of equivalents, by making, using (including by directing and controlling the equipment

and instrumentalities mentioned below), importing, selling, offering for sale, and supplying to customers infringing products and services, including the '839 Patent Accused Instrumentalities, without authority or license.

86.    Defendants indirectly infringe the '839 Patent, including at least claims 1 and 4 of the '839 Patent, pursuant to 35 U.S.C. § 271(b), by (among other things) and with specific intent or willful blindness, actively aiding and abetting infringement by others, such as Defendants' customers and end-users, in this District and elsewhere in the United States.  For example, through at least the filing and service of this Complaint, Defendants have had knowledge of the '839 Patent and the infringing nature of the '839 Patent Accused Instrumentalities.  Defendants' customers and end-users directly infringe through the use of the inventions claimed in the '839 Patent. Defendants induce this direct infringement by actively encouraging and instructing users of its services and products to use the '839 Patent Accused Instrumentalities.

87.    Claim 1 of the '839 Patent is reproduced below with the addition of labels [a], [b], [c], and [d] corresponding to portions of the claim.

> 1. A method for power control of control channels in a radio communication system comprising:
>
> [a] transmitting, with a first transmission power, first scheduling data in a common search space of a Physical Downlink Control Channel (PDCCH);
>
> [b] transmitting, with a second transmission power, second scheduling data in a specific search space of the PDCCH;
>
> [c] determining a magnitude of the first transmission power of the first scheduling data in the common search space of the PDCCH based on one or more first criteria; and

[d] determining a magnitude $P_i$ of the second transmission power of the second scheduling data in the specific search space of the PDCCH based on one or more second criteria independent from the first criteria.

Ex. B at 15:57-16:4.

88.    AT&T directs and controls all aspects of the '839 Patent Accused Instrumentalities deployed in its wireless networks.

89.    The '839 Patent Accused Instrumentalities embody and/or practice each and every limitation of at least claim 1 of the '839 Patent, literally or under the doctrine of equivalents, as described in the non-limiting examples set forth below.   These non-limiting examples are preliminary and are not intended to limit Empire's right to provide greater detail and scope concerning AT&T's infringement, including infringement by other aspects of the Defendants' cellular networks, products, or services, and other claims of the '839 Patent.

**"1. A method for power control of control channels in a radio communication system comprising:"**

90.    The '839 Patent Accused Instrumentalities provide and perform a method for power control of control channels in a radio communication system.   AT&T directs and controls all aspects of the '839 Patent Accused Instrumentalities that provide and perform a method for power control of control channels in AT&T's wireless networks.

91.    For example, AT&T, through the direction and control of the '839 Patent Accused Instrumentalities in its wireless networks, performs a method for power control of control channels where both 5G and LTE networks are available.   As previously alleged, AT&T advertises its ability to deliver "three flavors of 5G to [its] customers to give them unique experiences, faster speeds and capacity to do more of the things they like on [its] 5G network."   These "three flavors" are

low-band, mid-band, and high-band spectrum 5G+ networks.   https://about.att.com/pages/5g-plus.html.

92.    AT&T also advertises the capabilities of its 4G LTE network, stating, "[w]ith 4G Long Term Evolution (LTE2) technology, we can meet your demands to access a variety of content over our mobile network.   We use a strategy of technologies and frequencies to support our network."  https://www.att.com/support/article/wireless/KM1008740/.

93.    AT&T's cellular networks include Ericsson base station antennas, among other antennas.  As demonstrated below, at least AT&T's cellular networks comprising Ericsson base station antennas perform a method for power control of control channels in a radio communication system.

**"[a]    transmitting, with a first transmission power, first scheduling data in a common search space of a Physical Downlink Control Channel (PDCCH);"**

94.    The '839 Patent Accused Instrumentalities transmit, with a first transmission power, first scheduling data in a common search space of a PDCCH.[6]   AT&T directs and controls the '839 Patent Accused Instrumentalities in performing such transmission.

95.    For example, the '839 Patent Accused Instrumentalities transmit System Information Block 1 ("SIB1") in common search space CORESET 0 with a first transmission power in accordance with the applicable 3GPP standards for 4G and 5G communications. https://www.telecomtrainer.com/5g-nr-pdcch-channel-overview-and-processing.

---

[6] The PDCCH "plays a critical role in the control of downlink resource allocations, scheduling, and signaling for UEs (User Equipment)."   It is responsible for carrying Downlink Control Information ("DCI"), which informs UEs about the configuration of the Physical Downlink Shared Channel, which is responsible for transmitting user data.   Therefore, PCCDH provides dynamic scheduling information, informing UEs about the allocation of resources for downlink transmission.  https://www.telecomtrainer.com/5g-nr-pdcch-channel-overview-and-processing.

96.    3GPP standards provide that "[t]he UE shall monitor a set of PDCCH candidates on one or more activated serving cells as configured by higher layer signalling for control information, where monitoring implies attempting to decode each of the PDCCHs in the set according to all the monitored DCI [Downlink Control Information] formats. . . . The set of PDCCH candidates to monitor are defined in terms of search spaces, where a search space at aggregation level is defined by a set of PDCCH candidates."  The below figure is illustrative:

**Table 9.1.1-1: PDCCH candidates monitored by a UE**

| Search space $S_k^{(L)}$ | | | Number of PDCCH candidates $M^{(L)}$ |
|---|---|---|---|
| Type | Aggregation level $L$ | Size [in CCEs] | |
| UE-specific | 1 | 6 | 6 |
| | 2 | 12 | 6 |
| | 4 | 8 | 2 |
| | 8 | 16 | 2 |
| Common | 4 | 16 | 4 |
| | 8 | 16 | 2 |

3GPP TS 36.213 V18.2.0 (2024-03) Release 18, Section 9.1.1 (annotated).

97.    The below figure illustrates the overall MIB / SIB transmission flow and relationships.  Master Information Block ("MIB") and System Information Block ("SIB") are signals that provide information to UEs.



```
MIB ::= SEQUENCE {
    systemFrameNumber              BIT STRING (SIZE (6)),
    subCarrierSpacingCommon        ENUMERATED {scs15or60,
scs30or120},
    ssb-SubcarrierOffset           INTEGER (0..15),
    dmrs-TypeA-Position            ENUMERATED {pos2, pos3},
    pdcch-ConfigSIB1               INTEGER (0..255),
    cellBarred                     ENUMERATED {barred, notBarred},
    intraFreqReselection           ENUMERATED {allowed,
notAllowed},
    spare                          BIT STRING (SIZE (1))
```

https://www.sharetechnote.com/html/5G/5G_Mib_Sib.html.

98.     As shown in the figure, "*pdcchConfigSIB1: Determines a bandwidth for PDCCH/SIB, a common ControlResourceSet (CORESET), a common search space and necessary PDCCH parameters. This corresponds to RMSIPDCCH-Config.*"

https://www.sharetechnote.com/html/5G/5G_Mib_Sib.html (emphasis added).

### "[b]    transmitting, with a second transmission power, second scheduling data in a specific search space of the PDCCH;"

99.     The '839 Patent Accused Instrumentalities transmit, with a second transmission power, second scheduling data in a specific search space of the PDCCH.  AT&T directs and controls the '839 Patent Accused Instrumentalities in performing such transmission.

100.     For example, the '839 Patent Accused Instrumentalities transmit in a UE-specific search space with a second transmission power.

101.     As one example, each UE is assigned a specific search space for monitoring PDCCH. The UE configures its receiver to monitor this space to decode the PDCCH associated with its control information. https://www.telecomtrainer.com/5g-nr-pdcch-channel-overview-and-processing/.

102.     The following figure shows how UE-specific PDCCH candidates are monitored by a UE:

| Search space $S_k^{(L)}$ | | | Number of PDCCH candidates $M^{(L)}$ |
|---|---|---|---|
| Type | Aggregation level $L$ | Size [in CCEs] | |
| UE-specific | 1 | 6 | 6 |
| | 2 | 12 | 6 |
| | 4 | 8 | 2 |
| Common | 8 | 16 | 2 |
| | 4 | 16 | 4 |
| | 8 | 16 | 2 |

3GPP TS 36.213 V18.2.0 (2024-03) Release 18, Section 9.1.1 (annotated).

103.     The allocation of PDCCH is determined in part by a Block Error Rate ("BLER") target (a measurement of error in data transmission) along with a Channel Quality Indicator ("CQI") input (a metric used to determine the quality of the wireless channel, ranging from 0 to 15 in LTE systems and 0 to 31 in 5G systems). When the UE exhibits a high CQI, the eNB will assign a favorable aggregation layer. For instance, if the UE reports a CQI index of 12, indicating good radio conditions, the eNB will allocate aggregation layer 2. If the UE moves away and the eNB encounters increased BLER, the eNB will elevate the aggregation layer to 4 to enhance the

robustness of the PDCCH.   https://ourtechplanet.com/lte-throughput-optimization-part-1-pdcch-capacity-enhancement/.

104.    Another way of increasing the robustness of the PDCCH is to increase the PDCCH power—*e.g.*, by using dynamic power features for PDCCH, which can increase robustness by increasing the PDCCH power with the same aggregation layer.

105.    Ericsson base stations contain certain features for PDCCH aggregation level adjustments:  (1) PDCCH power boost for increasing the power of the PDCCH Resource Elements ("REs"), (2) enhanced PDCCH link adaptation (for changing the BLER target), and (3) PDCCH coverage extension (for use of more robust DCI format for downlink assignments in limited radio frequency conditions).     https://ourtechplanet.com/lte-throughput-optimization-part-1-pdcch-capacity-enhancement/.

106.    The power boost is beneficial in scenarios such as extending coverage through beamforming, increasing the range for small cells, and generally enhancing PDCCH capacity, which is particularly useful for applications like voice over LTE (VoLTE).   The power can be increased by up to 6 dB.     https://telecomstudy18.blogspot.com/2015/06/common-channel-configuration-in-lte.html.

107.    Additionally, in LTE systems, CQI is transmitted through a specific CQI Channel, which carries feedback information from the receiver to the transmitter.   This enables the transmitter     to     dynamically     adjust     its     transmission     parameters. https://www.telecomtrainer.com/cqi-channel-quality-indicator/.

108.    The following table demonstrates a 4-bit CQI index, modulation, code rate, and efficiency.  A 4-bit CQI index is a numerical representation of the channel quality of a wireless communication system.

**Table 7.2.3-1: 4-bit CQI Table**

| CQI index | modulation | code rate x 1024 | efficiency |
|---|---|---|---|
| 0 | out of range | | |
| 1 | QPSK | 78 | 0.1523 |
| 2 | QPSK | 120 | 0.2344 |
| 3 | QPSK | 193 | 0.3770 |
| 4 | QPSK | 308 | 0.6016 |
| 5 | QPSK | 449 | 0.8770 |
| 6 | QPSK | 602 | 1.1758 |
| 7 | 16QAM | 378 | 1.4766 |
| 8 | 16QAM | 490 | 1.9141 |
| 9 | 16QAM | 616 | 2.4063 |
| 10 | 64QAM | 466 | 2.7305 |
| 11 | 64QAM | 567 | 3.3223 |
| 12 | 64QAM | 666 | 3.9023 |
| 13 | 64QAM | 772 | 4.5234 |
| 14 | 64QAM | 873 | 5.1152 |
| 15 | 64QAM | 948 | 5.5547 |

3GPP TS 36.213 V18.2.0 (2024-03).

**"[c]    determining a magnitude of the first transmission power of the first scheduling data in the common search space of the PDCCH based on one or more first criteria; and"**

109.    The '839 Patent Accused Instrumentalities determine a magnitude of the first transmission power of the first scheduling data in the common search space of the PDCCH based on one or more first criteria.  AT&T directs and controls the '839 Patent Accused Instrumentalities in making such determinations.

110.    For example, the '839 Patent Accused Instrumentalities determine a magnitude of the first transmission power of the first scheduling data in the common search space of the PDCCH based on whether and the extent to which the PDCCH power boost feature is used in transmitting the parameters for SIB1 in accordance with the applicable 3GPP standards for 4G and 5G communications.

111.    For example, the '839 Patent Accused Instrumentalities account for CCE allocations.

112.    The PDCCH power boost feature makes it possible to adjust PDCCH power to match the number of needed CCE resources.

113.    Thus, the PDCCH power boost feature is triggered based on the number of CCE resources.

**"[d]    determining a magnitude $P_i$ of the second transmission power of the second scheduling data in the specific search space of the PDCCH based on one or more second criteria independent from the first criteria."**

114.    The '839 Patent Accused Instrumentalities determine a magnitude $P_i$ of the second transmission power of the second scheduling data in the specific search space of the PDCCH based on one or more second criteria independent from the first criteria. AT&T directs and controls the '839 Patent Accused Instrumentalities in making such determination.

115.    For example, the '839 Patent Accused Instrumentalities determine a magnitude of the second transmission power of the second scheduling data in the specific search space of the PDCCH based on whether and the extent to which the PDCCH power boost feature is used in connection with channel quality.

116.    As previously alleged, the allocation of PDCCH is based in part on a BLER target along with a CQI input. When the UE exhibits a high CQI, the eNB will assign a favorable aggregation layer. If the UE moves away and the eNB encounters increased BLER, the eNB will elevate the aggregation layer to enhance the robustness of the PDCCH. https://ourtechplanet.com/lte-throughput-optimization-part-1-pdcch-capacity-enhancement/.

117.    In at least AT&T's cellular networks using Ericsson base station antennas, the PDCCH power boost feature as it relates to the UE-specific search space is thus triggered based on the CQI and BLER.

118.    Claim 4 of the '839 Patent is reproduced below.

> 4. The method of claim 1, further comprising receiving a Channel Quality Indicator (CQI) from a specific user equipment (UE) with which the second scheduling data is associated, wherein the one or more second criteria include the received CQI.

Ex. B at 16:34-38.

119.    The '839 Patent Accused Instrumentalities embody each and every limitation of at least claim 4 of the '839 Patent, literally or under the doctrine of equivalents, as described in the non-limiting examples set forth below.  These non-limiting examples are preliminary and are not intended to limit Empire's right to modify these non-limiting examples or allege that other aspects of the Defendants' cellular networks or other products, infringe the identified claim, or any other claims, of the '839 Patent.

**"4. The method of claim 1, further comprising receiving a Channel Quality Indicator (CQI) from a specific user equipment (UE) with which the second scheduling data is associated, wherein the one or more second criteria include the received CQI."**

120.    The '839 Patent Accused Instrumentalities further receive a Channel Quality Indicator (CQI) from a specific user equipment (UE) with which the second scheduling data is associated, wherein the one or more second criteria include the received CQI.  AT&T directs and controls the '839 Patent Accused Instrumentalities in such reception of CQI.

121.    As previously alleged, the '839 Patent Accused Instrumentalities infringe claim 1 of the '839 Patent.

122.    As previously alleged, the '839 Patent Accused Instrumentalities receive a CQI from a specific UE with which the second scheduling data is associated, and determine a magnitude $P_i$ of the second transmission power of the second scheduling data in the specific search space of the PDCCH based in part on the received CQI.

123.    Defendants' infringement is willful, as AT&T had knowledge of the '839 Patent at least since the filing and service of this Complaint before using the '839 Patent Accused Instrumentalities.

124.    Without permission from or compensation to Empire, Defendants have used—and continue to use—the '839 Patent Accused Instrumentalities in the U.S.

125.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '839 Patent.  Empire has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for the infringement of the '839 Patent.

126.    As a result of Defendants' infringement of the '839 Patent, Empire has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants together with interest and costs as fixed by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Empire prays for a judgment in its favor and against Defendants and respectfully requests the following relief:

A.    A judgment in favor of Empire that Defendants infringe, either literally or under the doctrine of equivalents, the '957 and '839 Patents;

B.      Damages for infringement of the '957 and '839 Patents in an amount to be determined at trial;

C.      For other monetary relief, including costs, expenses, and pre- and post-judgment interest;

D.      A determination that Defendants' infringement of the '957 and '839 Patents is willful, and an award of enhanced damages, up to and including trebling of the damages awarded to Empire under 35 U.S.C. § 284;

E.      An order pursuant to 35 U.S.C. § 283 enjoining Defendants, their officers, directors, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further acts of infringement of the '957 and '839 Patents;

F.      A determination that this is an exceptional case under 35 U.S.C. § 285 and an award of attorneys' fees and costs to Empire; and

G.      An order awarding Empire any such other relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Empire hereby demands a jury trial as to all issues so triable.

Dated: August 21, 2025                    Respectfully submitted,

                                          /s/ *Elizabeth L. DeRieux*
                                          Elizabeth L. DeRieux
                                          Texas State Bar No. 05770585
                                          CAPSHAW DERIEUX, LLP
                                          114 East Commerce Avenue
                                          Gladewater, Texas 75647
                                          (903) 845-5770
                                          Email: ederieux@capshawlaw.com

                                          Christopher J. Gaspar (*pro hac vice* to be submitted)
                                          Nathaniel T. Browand (*pro hac vice* to be submitted)
                                          MILBANK LLP
                                          55 Hudson Yards
                                          New York, NY 10001-2163
                                          (212) 530-5000
                                          Email: cgaspar@milbank.com
                                          Email: nbrowand@milbank.com


                                          *Attorneys for Plaintiff*
                                          *Empire Technology Development LLC*